UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JOHN AFRIYIE,

                Petitioner,

      -v-

UNITED STATES OF AMERICA,

                Respondent.

21 Civ. 1549 (PAE)
16 Cr. 377 (PAE)

OPINION & ORDER

PAUL A. ENGELMAYER, District Judge:

The Court has received a petition from defendant John Afriyie to vacate his conviction and sentence pursuant to 28 U.S.C. § 2255.[1] For the reasons that follow, the Court denies the petition.

## I.  Background

On January 30, 2017, Afriyie was convicted after a one-week jury trial of securities fraud, in violation of 15 U.S.C. §§ 78l(b) and 78ff and 17 C.F.R. § 240.10b-5, and wire fraud, in violation of 18 U.S.C. § 1343. The charges were based on a brazen insider-trading scheme that Afriyie carried out while serving as an investment analyst at MSD Capital ("MSD"). Through his employment, Afriyie learned of MSD's plan to invest alongside Apollo Global Management ("Apollo") in Apollo's plan to acquire and take-private ADT Corp., a publicly traded company in the home security and alarm industry. Afriyie was not assigned to that transaction. He learned

---

[1] See Dkt. 195. The Court has considered on this application Afriyie's memorandum of law in support of this petition, Dkt. 197 ("D. Mem."), the Government's memorandum of law in opposition, Dkt. 200 ("G. Mem."), Afriyie's reply memorandum, Dkt. 202, and the full trial and appellate record, with which the Court is well familiar.

of it after MSD's compliance department issued a "potential restriction" email to its investment professionals indicating that MSD would receive material non-public information (MNPI) regarding a "U.S. based alarm monitoring company" in connection with a "financing opportunity" associated with a "potential take private transaction by . . . Apollo Global." Thereafter, Afriyie repeatedly accessed electronic research files on MSD's shared drive, which revealed the likely timing and terms of Apollo's acquisition of ADT. Using a TD Ameritrade account in the name of his mother, Afriyie then purchased more than 2,000 targeted call options, which cost a total of approximately $25,000. On February 17, 2016, ADT's stock price rose by more than 47% upon the disclosure of the transaction, and the value of Afriyie's call options rose by 6,000% in one day. Afriyie sold the options over the ensuing week, for a profit of $1,564,071.60.

On July 26, 2017, the Court sentenced Afriyie principally to a term of 45 months imprisonment, to be followed by a term of three years supervised release. Afriyie's conviction and sentence were affirmed on appeal by the United States Court of Appeals for the Second Circuit, save that the Circuit remanded to this Court to reconsider the tabulation of the amount Afriyie owed in restitution for the expenses MSD incurred in connection with the Government's investigation into Afriyie, in light of the Supreme Court's intervening decision in *Lagos v. United States*, 138 S. Ct. 1684 (2018). *See United States v. Afriyie*, 929 F.3d 63 (2d Cir. 2019), *cert. denied*, 140 S. Ct. 1228 (2020). After the Court tabulated those expenses, Afriyie again appealed, and the Second Circuit clarified, based again on intervening authority, that attorneys' fees arising from the Securities and Exchange Commission's investigation of Afriyie should be excluded from restitution. *See United States v. Afriyie*, 27 F.4th 161, 163 (2d Cir. 2022). The

Government's and Afriyie's tabulations of the restitution Afriyie owes, consistent with that Second Circuit ruling, are due to this Court on August 12, 2022. *See* Dkt. 225.

## II.     Afriyie's § 2255 Petition

Afriyie's § 2255 petition, filed February 19, 2021, is based on a single document admitted during the Government's case: Government Exhibit ("GX") 140. GX 140 is a photocopy of an Employment Confidentiality Agreement executed by Afriyie at the start of his employment with MSD. The agreement states, in pertinent part, that Afriyie's employment with MSD "creates a relationship of trust and confidence" including but not limited to the duty to protect confidential information, which includes "all non-public information or data relating to or in any way connected with the investments" of MSD Capital. The agreement bars the employee from "us[ing] any Confidential or Proprietary Information for any purpose."

Afriyie, who did not testify at trial, contends in his petition that he did not write the handwritten words "John Afriyie" above his signature line on GX 140, because he used a distinctive cursive signature at the time, whereas his name as handwritten on GX 150 is in printed, non-cursive letters. In support, he attaches the declaration of a handwriting expert, Grant Sperry.

Afriyie seeks relief based on the alleged forgery of his signature on GX 140 on two theories.

First, disputing that he signed the agreement at all, he claims the Government violated *Brady v. Maryland*, 373 U.S. 83 (1963), by not producing the original confidentiality agreement, which ostensibly would have supported his claim of forgery, and that it was error for the Court to receive the photocopy of the agreement as evidence at trial.

3

Second, he claims ineffective assistance of counsel, asserting that, before trial, he had asked his trial counsel to demand the original agreement but that they had failed to do so. Afriyie seeks an evidentiary hearing on these claims.

Substantially for the reasons given by the Government in its thorough memorandum of law in opposition, these two theories for relief in Afriyie's petition are not only meritless, but frivolous. In the interests of economy, the Court adopts here the Government's full exposition there of the legal and factual infirmities with these bids. The Court outlines these here in brief.

### A. *Brady*/Admission of GX 140

To the extent Afriyie claims a *Brady* violation in connection with GX 140 or that it was error to admit GX 140 at trial, Afriyie procedurally defaulted these associated claims by not bringing them on direct appeal.

As of that appeal, Afriyie was aware of all the facts (or asserted facts) undergirding these claims. He knew that (1) the Government had offered, and the Court had received in evidence, a photocopy of the employment agreement; (2) the hand-printed iteration of Afriyie's name on GX 140 did not resemble his characteristic signature; and (3) the original employment agreement had not been made available to the defense in discovery. Critically, Afriyie's newfound claim that the name as written on GX 140 was forged is not based on any information that he lacked at the time of his direct appeal. That a handwriting expert has opined, unsurprisingly, that that printed version does not match Afriyie's stylized signature does not make his claim of forgery any more available to him now than on appeal. Afriyie's petition does not adduce any evidence fortifying these claims. It does not point to any evidence (new or old) supporting the central premise of his claim of a *Brady* violation: that the Government possessed the original of the employment agreement. And it does not point to any evidence (new or old) supporting the theory that the

4

words "John Afriyie" above the signature line on GX 140 was forged by another person, as opposed to having been hand-printed by Afriyie himself.

Accordingly, whether this claim is cast as asserting a *Brady* violation or as challenging an evidentiary ruling, Afriyie's appellate counsel—who were different from his trial counsel—had every opportunity to bring this claim on appeal. Appellate counsel presumably did not do so not because the facts were unavailable—but, instead, because such a claim was transparently a loser. There was no factual support for a claim of a *Brady* violation; GX 140 was patently admissible, a foundation for its receipt having properly been laid at trial by percipient MSD personnel; and there was overwhelming independent proof at trial that Afriyie had been on notice—in general and as to the Apollo/ADT transaction—that he was forbidden to trade on confidential information that he acquired at MSD. But to the extent such a claim could be asserted, it was equally available to Afriyie on direct appeal then as it is now.

As such, Afriyie may pursue these claims in a § 2255 petition only on a showing of both cause and actual prejudice, or of actual innocence. *See Zhang v. United States*, 506 F.3d 162, 166 (2d Cir. 2007) ("If such a claim has not been presented on direct review, the procedural default bar may be overcome only where the petitioner establishes either (1) 'cause' for the failure to bring a direct appeal and 'actual prejudice' from the alleged violations; or (2) 'actual innocence.'") (quoting *Bousley v. United States*, 523 U.S. 614, 622 (1998)); *Gupta v. United States*, 913 F.3d 81, 84 (2d Cir. 2019) (collecting cases). "To demonstrate cause, 'the prisoner [must] show that some objective factor external to the defense impeded counsel's efforts.'" *Johnson v. United States*, No. 09 Civ. 5554 (PAE), 2013 WL 103174, at *4 (S.D.N.Y. Jan. 9, 2013), *aff'd*, 779 F.3d 125 (2d Cir. 2015) (quoting *Murray v. Carrier*, 477 U.S. 478, 488 (1986)). "To demonstrate prejudice, a petitioner must show that the degree of prejudice resulting from

any error 'infect[ed] his entire trial with error of constitutional dimensions.'" *Id.* (quoting *United States v. Frady*, 456 U.S. 152, 170 (1982)). Afriyie cannot show either.

***Cause***: As the Government demonstrates, Afriyie does not articulate cause for failing to raise this claim on direct appeal. *See* G. Mem. at 12–18.

***Prejudice***: Nor can Afriyie establish prejudice from his failure to challenge—on any theory—the receipt of GX 140 below. That is so for two reasons.

First, other trial evidence compellingly supported that, notwithstanding Afriyie's choice to sign his name in print rather than script, it was he who did so. As the Government points out, the manner in which Afriyie's name was handwritten on GX 140 was identical to the manner in which it was written on numerous other MSD documents executed at the start of his work at MSD whose authenticity Afriyie does not challenge. *See id.* at 22–23 (citing, *e.g.*, GXs 138–39). This confirms that Afriyie affixed his name to GX 140—and thereby acknowledged that he had read and agreed to the terms of the confidentiality agreement. And it undermines Afriyie's improbable thesis that only his script signatures could be found authentic. A jury exercising common sense and drawing on experience would instead easily recognize that a new employee executing multiple forms might choose to print their name where a signature was called for. On the flip side, Afriyie does not articulate a coherent theory why—let alone evidence that—unknown persons at MSD had any motive to forge the signature of new junior analyst Afriyie in January 2015. On the contrary, the trial evidence was that the Confidentiality Agreement was a routine document of general applicability at MSD. It became significant in Afriyie's case more than a year later, after his binge in January and February 2016 on perfectly timed ADT call options came to light months later.

Second, even if GX 140 were wholly disregarded, other trial evidence overwhelmingly established the unremarkable proposition for which GX 140 was received: Afriyie's knowledge that he had a duty to his employer MSD not to trade on its confidential deal information. This evidence included direct testimony from (1) three MSD employees, including the person who oversaw MSD's training program, and who authenticated various training materials that were furnished to Afriyie in July 2015 that set out this duty; (2) a document signed by Afriyie, in which he attested to having received, read and pledged to abide by MSD's employee handbook, and the handbook itself, which again squarely set out the duty of strict confidentiality as to such information and to refrain from trading on such information; (3) Afriyie's attestation to have read MSD's Code of Business Conduct and Ethics, which set out the same duties; and (4) attestations by Afriyie that he had complied with the Code in all material respects and pledged to do so in the future. Afriyie does not challenge the authenticity of these records or that they were properly received at trial.

Notably, too, there was no contrary evidence at trial on this point. With or without GX 140, the evidence did not give Afriyie a basis on which to claim unawareness of his duty not to trade on the information he had unearthed in MSD's shared drive as to the upcoming go-private transaction involving ADT. Thus, even if it had been error to receive GX 140 or if Afriyie's *Brady*-claim premise were established that another person had affixed Afriyie's name above the signature line on that document, the remaining evidence conclusively established his awareness of these basic duties.

***Actual innocence***: Afriyie does not claim actual innocence—the alternative showing to cause and prejudice. And any such claim would have been specious. As the Government chronicles, the proof at trial was conclusive—open and shut. It showed that Afriyie, well aware

7

of his fiduciary duties to MSD, twice engaged in insider trading schemes, drawing upon confidential deal information he had obtained through his employment, each time acting alone, and each time by purchasing exotic put or call options ahead of publicly undisclosed transactions to which MSD was a party.

The first scheme involved the company XPO Logistics. Afriyie bought put options in advance of the company's undisclosed dilutive transactions. The stock's price, however, did not move enough upon disclosure of these transactions for Afriyie to profit.

The second scheme involved ADT—and was the scheme for the securities and wire fraud counts of which Afriyie was convicted. Afriyie did not have any responsibility for any MSD projects involving ADT. However, evidence of Afriyie's "electronic footprints" showed that after MSD, in late January 2016, alerted its investment professionals that it would receive MNPI about a publicly traded alarm company, Afriyie repeatedly foraged through MSD's shared drive. He thereby accessed numerous confidential materials that enabled him to derive the date on and price at which the take-private transaction as to ADT would occur. Afriyie then, using the TD Ameritrade account of his mother, Lawrencia Afriyie, without her knowledge, bought complex, custom-designed call options on ADT keyed to that date and price. When the news of the ADT transaction broke, with terms consistent with those Afriyie had derived, he realized more than $1.5 million in profits (a 6,000% return).

The trial evidence amply established all elements of the two charged fraud offenses. And Afriyie's *mens rea*—his intent to defraud—was emphatically demonstrated by his awareness of the prohibition on such trading and his secretive and stealthy behavior, including his forays into the MSD shared drive for information about a deal to which he was not assigned and his decision to buy and sell the call options under his mother's name. And, if more were needed, Afriyie's

post-trading conduct confirmed his consciousness of his guilt. He posed as his mother on a recorded call with a representative of TD Ameritrade regarding the transactions, adopting a female voice on the call. Confronted by law enforcement agents in the month after the transaction went public, Afriyie then lied repeatedly to them, including by denying that it had been his voice on the call and that he had traded in ADT call options. Two days after having been confronted by the agents, Afriyie changed the name on the email account associated with the brokerage account, from his name to the name of a fictitious person, "Larry Afriyie." Afriyie then deleted the entire email account, including emails reflecting that he, not his mother, had controlled the brokerage account in which the ADT trading had occurred.

Finally, although evidence to this effect was not put before the jury, the day that his trial was to begin, Afriyie fled, requiring the Court to issue a bench warrant pursuant to which he was arrested in New Jersey.

In sum, to the extent Afriyie's § 2255 petition asserts claims based on *Brady* and/or the erroneous receipt of GX 140 at trial, Afriyie procedurally defaulted such claims by not raising them on appeal, and such claims do not remotely support overturning his conviction or his sentence.

### B.     Ineffective Assistance of Counsel

For related reasons, Afriyie's claim of ineffective assistance of counsel is meritless.

Claims of ineffective assistance are properly brought in a § 2255 proceeding. But for such a claim to prevail, a defendant must show both that (1) his counsel's representation fell below an objective standard of reasonableness; and (2) there is a reasonability probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 687–88, 694 (1984).

In applying *Strickland*'s first prong, a court must "consider particular claimed defects in the broader context of counsel's performance as a whole," *Jones v. Smith*, No. 09 Civ. 6497 (PAE) (GAY), 2012 WL 1592190, at *5 (S.D.N.Y. May 7, 2012) (internal quotation marks and citation omitted). That evaluation must be based on the facts known at the time, "not [on] hindsight to second-guess [counsel's] strategy choices." *Mayo v. Henderson*, 13 F.3d 528, 533 (2d Cir. 1994). Courts therefore start from the "strong presumption" that counsel's conduct fell "within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. Reasonable professional assistance is an "objective standard," evaluated "under prevailing professional norms." *Id.* at 688. There are many ways to effectively represent a criminal defendant, and "[e]ven the best criminal defense attorneys would not defend a particular client in the same way." *Id.* at 689–90. And "[a] defendant's Sixth Amendment rights do not . . . guarantee 'error free' representation." *Jones*, 2012 WL 1592190, at *5. Rather, to establish that counsel's performance was deficient "requires a showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Rivas v. Fischer*, 780 F.3d 529, 546–47 (2d Cir. 2015). As such, "[j]udicial scrutiny of counsel's performance must be highly deferential." *Strickland*, 466 U.S. at 689; *see also Rivas*, 780 F.3d at 547.

As to *Strickland*'s second prong, a petitioner who has pled guilty "must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill v. Lockhart*, 474 U.S. 52, 59 (1985). A petitioner alternatively may show prejudice by showing that he would have received and accepted a guilty plea with a lower sentence but for counsel's errors. *See Missouri v. Frye*, 566 U.S. 134, 147–48 (2012); *Lafler v. Cooper*, 566 U.S. 156, 174 (2012) (finding prejudice where defendant showed

10

that, but for counsel's deficient performance, there was a reasonable probability that defendant and the court would have accepted a guilty plea with a sentence less than a third of the length of the sentence he received after trial). In other words, a defendant claiming ineffective assistance in the plea-bargaining context must show that "the outcome of the plea process would have been different with competent advice." *Lafler*, 566 U.S. at 163.

Afriyie falls far short of establishing either required element.

As to trial counsels' representation, Afriyie's sole grievance entails counsels' decision not to challenge GX 140 as inadmissible and/or attempt to establish that his signature on that document had been forged. For the reasons reviewed above, these propositions were dubious in the extreme. Reasonable trial counsel had ample reason to forego such tactics, including on grounds of futility or that pursuing a claim of forgery before the jury endangered counsels' credibility.

In any event, the first *Strickland* prong focuses on counsels' overall performance. As is implicit in Afriyie's silence as to the balance of his representation at trial, his two estimable trial counsel were vigorous in his defense. The transcript reflects able conduct of pretrial litigation, and at trial, able jury addresses, examination of witnesses, evidentiary objections and arguments, and litigation as to the jury charge. That Afriyie was speedily convicted reflects the conclusive and multi-dimensional proof of his guilt, not any deficiency in counsel's performance. This Court, having presided over the trial, certifies that Afriyie's representation on trial—and at sentencing—was effective and strong, in the face of a high degree of difficulty.

As to the second *Strickland* prong, Afriyie cannot establish that, had his counsel been more effective as to the deficiencies he asserts, it is reasonably probable that the trial result would have been different. For the same reasons reviewed in connection with the prejudice and

11

actual innocence analyses above, the evidence of Afriyie's guilt was overwhelming. Had GX 140 not been before the jury—*i.e.*, had counsel fully succeeded in excluding it on any theory—the Court has no doubt that the jury's verdict would have been the same.

## CONCLUSION

For the reasons set out above, the Court dismisses Afriyie's § 2255 petition as meritless and indeed frivolous. The Court declines to issue a certificate of appealability. Afriyie has not made a substantial showing of a denial of a federal right, and appellate review is therefore not warranted. *See* 28 U.S.C. § 2253(c)(2); *Love v. McCray*, 413 F.3d 192, 195 (2d Cir. 2005). The Court also certifies that any appeal from this order would not be taken in good faith; therefore, *in forma pauperis* status is denied for purposes of an appeal. *Coppedge v. United States*, 369 U.S. 438, 445 (1962). The Clerk of Court is respectfully directed to terminate the case 21 Civ. 1549 and the motions pending at 16 Cr. 377, Dkts. 195 and 196, and to mail a copy of this order to Afriyie.

SO ORDERED.

*Paul A. Engelmayer*
Paul A. Engelmayer
United States District Judge

Dated: July 27, 2022
      New York, New York